**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| RS LEGACY CORPORATION, *et. al.*, | : | Case No. 15-10197 (BLS) |
| | : | |
| Reorganized Debtors. | : | (Jointly Administered) |
| _____ | : | |
| | : | |
| FABIOLA TOSCANO, on behalf of herself | : | |
| and all others similarly situated, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Re: Adv. Pro. No. 16-51033 (BLS) |
| v. | : | |
| | : | |
| THE RSH LIQUIDATING TRUST, PETER | : | |
| KRAVITZ, Liquidating Trustee, *et. al.*, | : | **Related Docket Nos: 4233, 4290, 4291, 4292,** |
| | : | **4293, 4315, and 4316** |
| Defendants. | : | |
| _____ | : | |

Christopher M. Samis
L. Katherine Good
Chantelle D. McClamb
WHITEFORD, TAYLOR & PRESTON LLC
The Renaissance Centre, Suite 500
405 North King Street
Wilmington, DE 19801

and

Jay R. Indyke, Esq.
Cathy Hershcopf, Esq.
COOLEY LLP
1114 Avenue of the Americas
New York, NY 10036

Co-Counsel for Liquidating Trustee

Joseph H. Huston, Jr.
Jason D. Angelo
STEVENS & LEE, P.C.
919 North Market Street, Suite 1300
Wilmington, DE 19801

and

Douglas N. Silverstein, Esq.
Mia Munro, Esq.
KESLUK, SILVERSTEIN & JACOB, P.C.
9255 Sunset Blvd., suite 411
Los Angeles, CA 90069-3309

and

Daniel I. Barness, Esq.
BARNESS & BARNESS, LLP
11377 W. Olympic Blvd., 2nd Floor
Los Angeles, CA 90064

Counsel for Plaintiff

## OPINION[1]

Before the Court is the Motion of Fabiola Toscano (the "Plaintiff" or "Ms. Toscano") for an Extension of the Bar Date for the Filing of Employee Vacation and Wage Claims, or, Alternatively, Leave to File and for Allowance of Such Claims (the "Motion") [Docket No. 4233].  The Motion requires the Court to address several discrete issues: (i) the nature of Ms. Toscano's claims (i.e. administrative, priority, general unsecured, or some mixture); (ii) the applicable bar date for Ms. Toscano's claims; and (iii) whether Ms. Toscano may file a late claim.

The Court finds that Ms. Toscano's claims consist predominantly of general unsecured claims, with a small portion potentially entitled to administrative status or priority under § 507(a)(4)(A).  The Court further finds that Ms. Toscano's tardy claims were subject to the applicable bar dates and that she has not demonstrated that her failure to comply with those deadlines were the result of "excusable neglect."  For the reasons set forth below, the Court will deny the Motion.

### JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(1).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (B).

### PROCEDURAL BACKGROUND

On February 5, 2015, each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Court ordered the cases jointly administered, and subsequently entered an order authorizing the Debtors to sell certain assets and perform certain obligations under the Asset Purchase Agreement (the "APA") [D.I. 1672].  On June 15, 2015, the Court entered the last of a number of orders regarding the APA [D.I. 2482], authorizing Debtors to sell substantially all of their assets to General Wireless Operations, Inc. ("General Wireless").  By order dated October 2, 2015, the Court

---

[1] This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure § 7052.

confirmed the First Amended Joint Plan of Liquidation of RS Legacy Corporation and Its Debtor

Affiliates, As Modified (the "Plan").  On October 7, 2015, the Liquidating Trust was created, Peter

Kravitz was appointed Liquidating Trustee, and the Plan became effective [D.I. 3114].

       The Court established July 10, 2015 as the general bar date for general unsecured prepetition

claims in these cases.  Separately, the Court established June 22, 2015 as the bar date for priority claims.

Finally, pursuant to the Plan, all claims that arose between June 1, 2015 and October 7, 2015 (the

"Effective Date") were subject to the Bar Date of December 7, 2015.  Ms. Toscano filed a class action

complaint initiating a Class Adversary Proceeding on July 22, 2016 (the "Complaint") [Adv. D.I. 1].  Her

Complaint was subsequently amended on September 30, 2016 (the "First Amended Complaint" or

"FAC") [Adv. D.I. 8] to state the following claims: (1) Garnishment of Vacation Wages in Violation of

California Labor Code § 221; (2) Unfair Business Practices in Violation of California Labor Code §§

17200 *et seq.*; (3) Failure to Pay Wages upon Discharge, in violation of California Labor Code §§ 201-

203; (4) Fraud; and (5) Breach of Contract.

       Ms. Toscano, on behalf of herself and all others similarly situated (the "Putative Class" [2]), moves

this Court for leave to late file claims on account of unpaid wages for unused vacation or reinstatement of

vacation benefits [D.I. 4233] (the "Motion for Leave").  Peter Kravitz, as Liquidating Trustee of the RSH

Liquidating Trust objected [D.I. 4290].  Oral argument was heard and the Motion has been fully briefed

and is ripe for consideration.  For the reasons stated below, the Motion is denied.

## FACTUAL BACKGROUND

       Leading up to Debtors' Chapter 11 filing on February 5, 2015, Ms. Toscano was employed at

RadioShack as a Market Sales Manager for more than five years.  Toscano Decl., p. 1 [Docket No. 4233-

3].  RadioShack sold its business to General Wireless through a § 363 sale during its bankruptcy case.

---

[2] The Putative Class is described generally: as Former RadioShack employees, who: (1) had earned vested vacation wages in 2015; (2) whose earned vested vacation wages were denied or not paid / or were not recognized by any of the Defendants in the Class Adversary Proceeding at any time thereafter; and (3) who thereby lost their earned vested vacation wages.  There are three subclasses as described in Paragraph 33 of the FAC.

Ms. Toscano continued working during the pendency of the bankruptcy, first for the Debtor, and subsequently for General Wireless. *Id*. at 5. During this period, Ms. Toscano states that she believed that the bankruptcy and accompanying sale would not affect her accrued vacation benefits. *Id*. at 3. Ms. Toscano left her employment with General Wireless on December 5, 2015. *Id*. On December 6, 2015, one day after voluntarily leaving her employment with General Wireless, Ms. Toscano claims she became aware that General Wireless would not compensate her for the majority of her unpaid accrued vacation benefits earned prior to the RadioShack bankruptcy. *Id*. at 5. The FAC alleges that RadioShack, RS Legacy, and General Wireless, either individually or collectively, violated California labor law in failing to pay accrued vacation benefits to Ms. Toscano and all other similarly situated employees.

The FAC alleges that RadioShack and General Wireless conspired and intentionally misled Ms. Toscano and the Putative Class by failing to adequately notify them regarding their plans about how accrued vacation benefits would be treated and which entity, if any, would ultimately be responsible for paying them. FAC at 6. In support of this theory, Ms. Toscano points to several communications from RadioShack and General Wireless to employees.

The first such communication was an open letter posted to the RadioShack intranet in early February 2015. Motion at p. 9. It states, among other things:

> We have filed various requests with the bankruptcy court, known as "First Day Motions" seeking to pay or honor certain pre-filing obligations to employees, customers and vendors. For our associates this includes authority to continue, without interruption, the payment of payroll, medical and dental coverage, and other important services to our associates as usual.

*Id*. Attached to the letter was a list of "Employee FAQ's" which stated:

> 4. Will I be paid as usual? Will employee benefits be affected? The company has submitted a motion to the Bankruptcy Court requesting that wages are paid as usual and health benefits continue without interruption. Other than severance, employee benefits are not expected to change. We are confident that this motion will be approved shortly.

*Id*. The next relevant communication came after Ms. Toscano accepted the transfer of her employment to General Wireless in April 2015 following the Court-approved sale. On August 12, 2015, there was an intranet posting under the heading "Vacation Policy Update" that read:

> During this time [prior to August 1, 2015] RS Legacy Corporation has remained your employer and thus is responsible for your compensation, through and including July 31, the date on which your employment with RS Legacy Corporation ended.  General Wireless has made an offer of employment to you, and by accepting the offer, your employment with General Wireless began on August 1, 2015, and you began to enjoy your benefits, including vacation, under our policies.  Although [new] employees of General Wireless ordinarily would not begin to accrue vacation time until their first day of employment and General Wireless has no obligation to allow employees to accrue vacation before their employment commences, in this instance only, we will grant each employee a beginning vacation pay balance equal to the vacation the employee would have earned between April 4, 2015 (the beginning of the first payroll week following the date of the close of the sale of assets to General Wireless) and July 31, 2015, less any vacation taken during that period. … The decision to offer this vacation benefit is entirely discretionary on the part of General Wireless and has no effect on any claim an employee may have for vacation benefits from RS Legacy Corporation, as General Wireless is not assuming any vacation obligation owed by RS Legacy Corporation to you and is not a successor in interest under the bankruptcy court order.

Motion at p.10.  This announcement, on August 12, 2015, only became available to employees after the July 10, 2015 bar date.  Ms. Toscano argues that this sequence of events is evidence that RadioShack and General Wireless sought to conceal information in an effort to escape liability for accrued vacation benefits.  Motion at p.11. RadioShack denies this charge, and argues that Ms. Toscano had legally sufficient notice and failed to investigate her own claim.  Objection at p.23.

On March 13, 2015, the Claims Agent served the Sale Notice on Ms. Toscano.  Motion at p.5. The Sale Notice provided, among other things, instructions regarding how parties could obtain copies of the sale documents and other information via the Claims Agent.  *Id*. at pp.5-6.  One such document Ms. Toscano could have obtained from the Claims Agent was the Asset Purchase Agreement (the "APA").

Section 7.9 of the APA provides, in pertinent part:

> [General Wireless] may offer employment effective as of the Closing Date of following the Closing Date to such employees as [General Wireless] shall determine in its sole discretion, at such salary/wage levels, with such benefits and under such other terms and conditions as [General Wireless] may determine in its sole discretion.  Any employee who accepts an offer of employment from [General Wireless] on or after the Closing Date shall be referred to herein as a "Transferred Employee**." [RadioShack] shall retain all liabilities (including <u>accrued vacation</u> and liabilities arising in connection with COBRA) in respect of all of its employees, include Transferred Employees, other than liabilities associated with any Transferred Employee's service with [General Wireless]** after the date of such Transferred Employee's employment by [General Wireless]…

5

Section 7.9 of APA (*emphasis added*).  On May 26, 2015, the Claims Agent served Ms. Toscano with the Bar Date Notice.  RadioShack argues that these notices, served on Ms. Toscano in March and May, respectively, operate as legally sufficient notice that RadioShack retained liability for unpaid vacation benefits accrued prior to April 4, 2015, and that any claim for such benefits had to be filed by July 10, 2015.

## DISCUSSION

### *Nature of Claim*

The parties dispute whether Ms. Toscano's claim should be characterized as administrative priority, 507(a)(4)(A) priority, or general unsecured.  Ms. Toscano argues that her claim for vacation pay is entirely administrative, citing to California Labor Code § 227.3, that states that the right to payment for unused vacation arises only after the "employee is terminated without having taken off his vested vacation."  Ms. Toscano argues that any claim for unused vacation benefits, whenever they accrued, constitute "actual, necessary costs and expenses of preserving the estate" in the form of "wages, salaries, and commissions for services rendered after the commencement of the case."  § 503(b)(1)(A)(i). Therefore, according to Ms. Toscano, her claim is entitled to administrative priority under 503(b)(1)(A)(i) because the right to payment for unused vacation arose post-petition.

The Liquidating Trustee argues that Ms. Toscano's claim is not entirely administrative, but instead is subject to some other varying degree of priority under the Code.  The Liquidating Trustee reasons that vacation time is a component of wages earned.  Thus, only vacation time that was earned post-petition is entitled to administrative priority, while any vacation time earned 180 days immediately preceding filing is entitled to 507(a)(4)(A) priority.  Vacation time earned prior to the 180 day cut-off should be treated as a general unsecured claim.

The Court agrees with the Liquidating Trustee's analysis. The fact that unused vacation time only becomes payable upon a post-petition termination is not relevant to the Court's analysis. Vacation time earned as a portion of compensation over a period of six years is not transformed into an administrative priority claim simply because an employee is terminated post-petition.  Administrative priority applies to

unused vacation benefits only to the extent those benefits were earned post-petition.  Section 507(a)(4)(A)

priority is appropriate for unused vacation pay only to the extent the benefits were earned 180 days prior

to the petition.  All other unused vacation pay is a general unsecured claim.  Assuming Ms. Toscano

earned vacation benefits over six years of employment, 1,950 days of that period earned vacation time

entitled to general unsecured status, 180 days earned vacation time entitled to priority status, and 60 days

earned vacation time entitled to administrative status.

<u>Allowance of Late Claims</u>

The Court's legal analysis will focus on excusable neglect, not the § 503(b) "for cause" standard.[3]

Rule 9006(b) permits the Court to allow a late-filed claim if the claimant can show that the tardiness "was

the result of excusable neglect."  In its "excusable neglect" analysis, the *Pioneer* Court held that the

determination was "an equitable one, taking account of all relevant circumstances surrounding the party's

omission" and listed four factors for consideration: (1) the danger of prejudice to the debtor; (2) the length

of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including

whether it was within the reasonable control of the Ms. Toscano; and (4) whether the Ms. Toscano acted

in good faith.  *Pioneer Inv. Serv. Co. v. Brunswick Assoc. Ltd. P'ship.*, 507 U.S. 380, 395 (1993).  "All

factors must be considered and balanced; no one factor trumps the others."  *Hefta v. Off'l Comm. Of*

*Unsecured Creditors* (*In re American Classic Voyages Co.*), 405 F.3d 127, 133 (3rd Cir. 2005).

Ms. Toscano argues that the Court should consider the *Pioneer* factors against the backdrop of

Debtors' alleged wrongful conduct, including failing to disclose the California vacation benefits on its

---

[3] While Ms. Toscano urges this Court to find "cause" under § 503(a) permitting her late filed claim, the § 503(a) standard is inapplicable in this case because Ms. Toscano's claim is not entirely administrative.  In fact, Ms. Toscano's claim is predominantly *not* administrative.  Any vacation benefits accrued from the beginning of Ms. Toscano's employment up to 180 days prior to February 5, 2015 is a general unsecured claim.  Any vacation benefits that accrued between 180 days prior to February 5, 2015 and that date are entitled to priority status.  Any vacation benefit accrued between February 5, 2015 and April 4, 2016 (the date on which General Wireless assumed vacation benefits) are administrative.  This short, two month period accounts only for a small fraction of Ms. Toscano's claim for vacation benefits.  Additionally, while "excusable neglect" and "for cause" are obviously different standards, the operative facts and the necessary analysis are sufficiently similar here to permit the Court to avoid performing its analysis twice.  The Court will therefore apply the Rule 9006(b) excusable neglect standard to all of Ms. Toscano's claims.

schedule of claims and "blasting" employees via daily intranet communications insinuating that vacation benefits would not be affected by the bankruptcy.

The Liquidating Trustee contends that allowing Ms. Toscano's late claim will prejudice the Debtors because it will necessarily open the floodgates to claims from other employees, and the sheer volume and unquantifiability of potential late claimants would upset the Trust's economic model and jeopardize approximately $3.6 million in distributions to non-professional claimants already made. The Liquidating Trustee also argues that allowing a late-filed class action here undercuts both of the core policies underpinning the bar date: finality for the debtor *and* protection for diligent creditors. Further, the Liquidating Trustee argues that a late-filed claim class action here would likely sweep in claimants who have not even been diligent enough to file a *late* claim.

The first *Pioneer* factor, prejudice, does not refer to an imagined or hypothetical harm; a finding of prejudice must be a conclusion based on facts in evidence. *Manus Corp. v. NRG Energy, Inc. (In re O'Brien Envt Energy, Inc.)*, 188 F.3d 116, 127 (3rd Cir. 1999). The *O'Brien* Court discussed several relevant considerations for addressing prejudice: (i) whether the debtor was surprised or caught unaware by the assertion of a claim that it had not anticipated; (ii) whether the payment of the claim would force the return of amounts already paid out under the confirmed plan or affect the distribution to creditors; (iii) whether the payment of the claim would jeopardize the success of the debtor's reorganization; (iv) whether allowance of the claim would adversely impact the debtor; and (v) whether allowance of the claim would open the floodgates to other late claims. *Id*. at 126-28.

Ms. Toscano argues that all five *O'Brien* prejudice factors weigh in her favor. First, Ms. Toscano alleges in the FAC that Debtor acted in concert with the GW Entities to deliberately "cut-off" vacation benefits, and therefore cannot claim surprise. Second, as of the date Ms. Toscano's Motion was filed, no distributions had been made with the exception of post-confirmation professionals. Third, the Debtors' have confirmed a liquidating plan – there is no reorganization to be threatened. Fourth, the Debtor cannot be adversely impacted by allowance of a *bona fide* claim here because, as with the third factor, the liquidating plan is clearly defined. Finally, Ms. Toscano argues that since her claims are based on

California state law, and she represents all similarly situated plaintiffs, allowing her claim does not open the "floodgates" for other litigants to file late claims.

The Court finds here that the first *Pioneer* factor weighs in favor of the Liquidating Trustee, on account of the real harm to the economic assumptions governing the Liquidating Trustee's operation thus far, and the potential threat of future unknown late claimants. The Liquidating Trustee was appointed on October 7, 2015. In the one-year period between then and October 21, 2016, the Liquidating Trustee has reconciled and paid approximately half of the 3,000 administrative claims filed in these cases. *Id*. at 18. The Liquidating Trustee has paid out approximately $3,591,867.86 in satisfaction of administrative claims.[4] *Id*. at 19. Finally, the Liquidating Trustee has settled or objected to certain administrative claims based upon the liquidation analysis in the Plan – an analysis that does not include Ms. Toscano's claim. *Id*. 20. The bar date permits the Liquidating Trustee to clearly define the estate. Allowing Ms. Toscano's claim this late would impact the assumptions the Liquidating Trustee has reasonably relied upon – significantly prejudicing the estate and creditors, and delaying the further administration of the cases.

Ms. Toscano's Motion also presents a plausible threat of inviting other late filed claims for two reasons. First, Ms. Toscano argues that, because her claim is a class action and includes all similarly situated creditors, there will not be any other claimants. She is only partly correct. In the Court's experience, many states have enacted labor laws that govern employees' rights to unpaid vacation wages. There is no reason to presume that former RadioShack employees in other states might not have potential claims for unpaid vacation benefits arising under their state's law. Second, the fact that Ms. Toscano's Motion involves a putative class action strikes this Court as more damaging to the policy underlying bar dates:

> The establishment and enforcement of a bar date for filing claims "furthers the policy of finality designed to protect the interests of a debtor and his diligent creditors and the expeditious administration of the bankruptcy." *In re Peters*, 90 B.R. 588, 597 (Bankr. N.D.N.Y., 1988). Furthermore, "to allow the debtor to be continually pursued by his

---

[4] This figure does not include amounts paid to professionals. Ms. Toscano argued that the only payments made by the Liquidating Trustee were to professionals and therefore little to no harm would be done to similarly situated creditors. The figure refutes in large measure Ms. Toscano's argument.

creditors ad infinitum … would be to sanction a form of slow torture contrary to the spirit and purposes of the bankruptcy laws." *Id.*

*U.S. Airways*, 2005 WL 3676186 at *7-*8.  A class action, if certified by this Court, would potentially sweep into the case a host of claimants who not only failed to file a timely claim, but also those who failed to file a late claim, including claimants who have done nothing thus far to assert their claim in RadioShack's bankruptcy.  The bar date protects diligent creditors.  Ms. Toscano's Motion exacts too high a cost at the expense of these diligent creditors.  These fears are more than hypothetical or imagined: allowing Ms. Toscano's late filed claim would almost certainly invite other claimants to file late claims.

The second *Pioneer* factor considers the length of the delay in filing the proof of claim and the impact of the delay on the judicial proceedings.  Both parties argued vigorously about the nature of Ms. Toscano's claims.  If Ms. Toscano is correct, and her claim is entirely administrative, the administrative bar date (December 7, 2015) is applicable and Ms. Toscano's claim is only approximately seven months late.  If the Liquidating Trustee is correct, and her claim is a mixture of general unsecured and priority claims, the June 22, 2015 or July 10, 2015 bar date is also applicable and Ms. Toscano's claim is approximately 13 months late.

Regardless of which date governs, the second *Pioneer* factor weighs in favor of the Liquidating Trustee.  As discussed above, Ms. Toscano's claim is not entirely administrative.  Ms. Toscano missed the general unsecured bar date by over a year, the administrative bar date by at least seven months, post-dates the confirmation of the Debtor's plan by 15 months, and was filed after the Liquidating Trustee had already made approximately $3.6 million in distributions to non-professional creditors.  At the latest, Ms. Toscano had notice and knowledge of her potential claim on August 12, 2015.  Yet she took no action to alert RadioShack or this Court of her potential claim until at least 11 months later.  For these reasons, this Court finds this factor to weigh against a finding of excusable neglect.

The third *Pioneer* factor considers the reason for the delay in filing a claim and whether that delay was within Ms. Toscano's control.  Ms. Toscano's theory posits that Debtors and the GW Entities intended to conceal the change in employee vacation benefits to avoid paying the amounts due under

California labor law.  In support of this theory, Ms. Toscano highlights the intranet postings to RadioShack employees updating the bankruptcy case following the February 2015 filing indicating that employee benefits were not expected to change; Debtors did not mention the term "California employees" anywhere in the schedules, disclosure statement, or Plan; and it was not until August 12, 2015, after the applicable bar date, that a notice was posted on the intranet stating that GW Entities were not responsible for unpaid vacation wages accrued before April 4, 2015.  Taken together, according to Ms. Toscano, these facts illustrate a concerted effort on behalf of Debtors and GW Entities to lull employees into inaction and avoid having to pay legitimate claims.

The Liquidating Trustee argues that Ms. Toscano failed to investigate her own claim and therefore cannot claim excusable neglect.  In support of this assertion, the Liquidating Trustee points to both the Bar Date Notice and Sale Notice.  At the latest, Ms. Toscano knew about her potential claim no later than August 12, 2015, when she received the "Vacation Policy Update" from General Wireless.  Ms. Toscano did not do anything to assert a claim until July 22, 2016, over eleven months later.

The Court is sympathetic to the difficulties faced by claimants, who often must wade through complicated notices to ascertain whether action is necessary to preserve their rights.  However, Ms. Toscano acknowledges that she became aware of her potential claim against Debtor via one of these documents, the "Vacation Policy Update" which she received on August 12, 2015.  After receiving this notice, she did nothing to investigate or pursue this claim for close to a year.  No reason was proffered for this delay, either in Ms. Toscano's briefs or at argument.  The record before the Court does not lead to a finding that Ms. Toscano's inaction was beyond her control.  Because the length of Ms. Toscano's delay after admittedly becoming aware of her claim was unexplained and significant, particularly when coupled with the real prejudice that would result in potential other late claimants that would adversely impact the Liquidating Trustee's economic models and any progress in claims administration made thus far, the Court is unable to find excusable neglect pursuant to Bankruptcy Rule 9006(b)(1).[5]

---

[5] The Court does not reach the final *Pioneer* factor because Ms. Toscano's good faith is not in dispute and does not materially alter the analysis.

**CONCLUSION**

Ms. Toscano is not permitted to file a late-claim because her claim is almost entirely a general

unsecured claim, not an administrative claim, and the *Pioneer* factors require finding Ms. Toscano's

tardily filed claim cannot be permitted for "excusable neglect."  For the foregoing reasons, the Motion is

denied.


Date:    August 31, 2017

                                        Brendan Linehan Shannon
                                        Chief United States Bankruptcy Judge